J-S45043-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ANDRE MAYBERRY | : | |
| | : | |
| Appellant | : | No. 3566 EDA 2019 |

Appeal from the Judgment of Sentence Entered August 2, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001279-2018

BEFORE: BOWES, J., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                    **FILED NOVEMBER 10, 2020**

Andre Mayberry (Appellant) appeals from the judgment of sentence imposed after a jury found him guilty of conspiracy to commit murder.[1] Appellant's counsel (Counsel) also seeks to withdraw from representation pursuant to ***Anders v. California***, 386 U.S. 738 (1967), and ***Commonwealth v. Santiago***, 978 A.2d 349, 361 (Pa. 2009). Upon review, we grant Counsel's petition to withdraw and affirm Appellant's judgment of sentence.

> On October 22, 2013, the decedent, Christopher Parker, called Derrell Daughtry, in order to go out, buy some PCP, and get high. Unbeknownst to Parker, Daughtry and [Appellant], had been planning to put "a hit" out on Parker. [Appellant] was dealing drugs for a man known as "Sheen," and Parker had pulled a gun on [Appellant] and stolen drugs from him. Daughtry got high with Parker, and dropped him off at his house, but made plans to see him later that night, ostensibly to get high on PCP again.

---

[1] 18 Pa.C.S.A. §§ 903 and 2502.

Later that evening, Daughtry and his friend, Abdul Rahim, whom Daughtry referred to as "Dully,"[FN] 4 picked up Parker at his house. They headed to a location that [Appellant] had instructed Daughtry to drive to with Parker. As they got underway, Daughtry sent a text to [Appellant] stating, "we going to get that wet."[FN] 5 The location bordered a fenced-in cemetery, which adjoined the driveway of the house where [Appellant] lived. There was a break in the fence right by [Appellant's] property.

> [FN] 4 Dully was also known as "Salahudin Rahim."
>
> [FN] 5 "Wet" is the street name for PCP.

While they waited in the parked car, with Parker thinking a drug delivery was coming, Daughtry got out and walked to a nearby store. While out of the car, Daughtry called [Appellant], who told Daughtry that he was unable to see them. Daughtry then sent a text to Dully saying, "he said to pull up some more." At around the same time, Daughtry heard gunshots.

At approximately 12:35 a.m., police received a 911 call of shots at 6900 15th Street. Upon their arrival at the scene, they observed Parker in the rear seat behind the driver's side and who was unconscious and slumped over. Officers also noticed a cellphone in his hand or lap and shell casing on the backseat as well as on the grass outside the rear passenger door. Medics arrived at the scene and confirmed that Parker was dead. The medical examiner later determined that Parker had sustained 25 gunshot wounds in multiple locations of the body. Specifically, Parker sustained two wounds to the head, three wounds to the neck, about five to the torso and multiple gunshot wounds to the right upper extremity and bilateral thighs. Ballistics proved that the bullets that killed Parker came from two different weapons, that is, a .45-caliber weapon and .9-millimeter weapon.

Police interviewed an individual who lived in the area, Zina Lawson, following the 911 call for shots fired. Ms. Lawson told police that when she was returning to her home at around 12:50 a.m. on October 23, 2013, she saw a white car parked with the driver's side open on the left side of 15th Street. Ms. Lawson also saw a 5'3" black male walking on the side of the grave yard away from the car. The parties agreed that based on [Appellant's]

> PennDOT license information certificate [Appellant's] height was 5'3".

Trial Court Opinion, 6/25/20, at 2-3 (citations and some footnotes omitted).

Appellant was charged with murder, generally, conspiracy to commit murder, and various weapon offenses. On April 26, 2019, a jury convicted Appellant of conspiracy to commit murder.[2] On August 2, 2019, the trial court sentenced Appellant to 20 to 40 years of incarceration. On August 9, 2019, Appellant filed a post-sentence motion for reconsideration of sentence, which the trial court denied on November 4, 2019. On November 15, 2019, Appellant's counsel filed a motion to withdraw. The trial court granted counsel's motion and appointed Counsel to represent Appellant on appeal. Appellant thereafter filed a timely notice of appeal. Both Appellant and the trial court have complied with Rule of Appellate Procedure 1925.

On July 28, 2020, Counsel filed an ***Anders*** brief, in which he argues that Appellant's appeal is frivolous and requests permission from this Court to withdraw as counsel. Appellant did not file a response to Counsel's ***Anders*** brief and did not raise any additional claims.

At the outset, we note the specific mandates counsel seeking to withdraw pursuant to ***Anders*** must follow. These mandates and the significant protection they provide to an ***Anders*** appellant arise because a criminal defendant has a constitutional right to a direct appeal and to counsel

---

[2] The jury could not reach a verdict for the murder charge and found Appellant not guilty of the various weapon offenses. The trial court declared a mistrial regarding the murder charge, and the Commonwealth elected not to retry Appellant.

on that appeal. ***Commonwealth v. Woods***, 939 A.2d 896, 898 (Pa. Super. 2007).

> We have summarized the requirements as follows:
>
> Direct appeal counsel seeking to withdraw under ***Anders*** must file a petition averring that, after a conscientious examination of the record, counsel finds the appeal to be wholly frivolous. Counsel must also file an ***Anders*** brief setting forth issues that might arguably support the appeal along with any other issues necessary for the effective appellate presentation thereof.
>
> ***Anders*** counsel must also provide a copy of the ***Anders*** petition and brief to the appellant, advising the appellant of the right to retain new counsel, proceed pro se or raise any additional points worthy of this Court's attention.
>
> If counsel does not fulfill the aforesaid technical requirements of ***Anders***, this Court will deny the petition to withdraw and remand the case with appropriate instructions (e.g., directing counsel either to comply with ***Anders*** or file an advocate's brief on Appellant's behalf).

***Id.*** (citations omitted).

Additionally, there are requirements as to the content of an ***Anders*** brief:

> [T]he ***Anders*** brief that accompanies court-appointed counsel's petition to withdraw … must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

***Santiago***, 978 A.2d at 361. When faced with a purported ***Anders*** brief, we may not review the merits of the underlying issues without first deciding

whether counsel has properly requested permission to withdraw. ***Commonwealth v. Wimbush***, 951 A.2d 379, 382 (Pa. Super. 2008) (citation omitted). If counsel has satisfied the above requirements, it is then this Court's duty to review the trial court proceedings to determine whether there are any other non-frivolous issues that the appellant could raise on appeal. ***Commonwealth v. Dempster***, 187 A.3d 266, 272 (Pa. Super. 2018) (*en banc*).

Instantly, we conclude that Counsel has complied with the requirements outlined above. Counsel filed a petition with this Court stating that after reviewing the record, he finds this appeal to be wholly frivolous. Motion Seeking Permission to Withdraw as Counsel, 7/28/20, ¶ 3. In conformance with ***Santiago***, Counsel's brief includes summaries of the facts and procedural history of the case, and discusses the issues he believes might arguably support Appellant's appeal. ***See Anders*** Brief at 4-16, 19-33. Counsel's brief sets forth his conclusion that the appeal is frivolous and includes citation to relevant authority. ***Id.*** Finally, Counsel has attached to his petition to withdraw the letter he sent to Appellant, which enclosed Counsel's petition and ***Anders*** brief. Motion Seeking Permission to Withdraw as Counsel, 7/28/20, Ex. A. Counsel's letter advised Appellant of his right to proceed *pro se* or with private counsel, and to raise any additional issues that he deems worthy of this Court's consideration. ***Id.*** We thus proceed to review the merits of Appellant's claims.

Counsel's ***Anders*** brief raises three issues:

1. THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION BY DENYING APPELLANT'S MOTION FOR A MISTRIAL AFTER IT WAS REVEALED THAT THE COMMONWEALTH DID NOT PROVIDE **BRADY** MATERIAL.

2. THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION BY DENYING APPELLANT'S MOTION FOR RECONSIDERATION BECAUSE THE COURT DID NOT CONSIDER MITIGATING CIRCUMSTANCES AND THE SENTENCE IMPOSED UPON APPELLANT IS EXCESSIVE.

3. THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR EXTRAORDINARY RELIEF TO ARREST JUDGMENT ON THE CONSPIRACY MURDER CONVICTION BECAUSE THE COMMONWEALTH FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT APPELLANT FORMED AN AGREEMENT WITH ANOTHER PERSON THE OBJECT OF WHICH WAS TO SHOOT AND KILL THE VICTIM.

**Anders** Brief at 19, 25, 29.

In his first issue, Appellant argues that the trial court abused its discretion in denying his motion for a mistrial based on a potential **Brady**[3] violation. The trial court summarized Appellant's argument:

Here, the alleged **Brady** material consisted of a possible statement taken by federal authorities from a federal defendant named Jeron Cartwright. Cartwright was connected to the case at bar through Tyree Scott, the brother of witness and co-conspirator Derrell Daughtry. Scott had introduced [Appellant] to Daughtry years before the murder, and had been friends with both [Appellant] and Sheen, [Appellant's] boss in the drug trade. According to Daughtry, not only were [Appellant] and Sheen looking for Parker at the time of the killing, but Scott was as well. On the day of the murder, in addition to tipping off [Appellant] about the whereabouts of Parker, Daughtry also called Scott. During the conversation, Daughtry told Scott that Daughtry, [Appellant], and "Rashim," were setting up Parker to be murdered.[FN] 6 According to Scott's testimony at trial, Scott took

---

[3] **Brady v. Maryland**, 373 U.S. 83 (1963).

the call on a speakerphone, and Cartwright was present and overheard the conversation. Later, Scott and Cartwright were indicted by federal authorities for an unrelated drug case, and according to Scott, Cartwright told the federal authorities about the telephone call.

> [FN] 6 While the notes of testimony say, "Rashim," it is likely that Scott either said, or was referring to, Abdul Rahim, the given name of "Dully", who was driving the car with Daughtry and Parker on the night of the murder.

Defense counsel argued that if Scott were being truthful about Cartwright, then the federal authorities likely had a written statement from Scott about the telephone call, but that no statement had ever been provided to him with the discovery in this case. According to defense counsel, if there was no written statement from Cartwright, or if there was a statement that contradicted Scott's version, that "that could be *Brady*," since it would impeach Scott's testimony.

Trial Court Opinion, 6/25/20, at 4-5 (citations omitted).

In *Brady*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment. . . ." *Id.* at 87. We are guided by the following *Brady* principles:

[T]he duty to disclose such evidence is applicable even if there has been no request by the accused, and the duty may encompass impeachment evidence as well as directly exculpatory evidence. Furthermore, the prosecution's *Brady* obligation extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution.

On the question of materiality, the Court has noted that such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the

- 7 -

remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Thus, there are three necessary components that demonstrate a violation of the **Brady** strictures: the evidence was favorable to the accused, either because it is exculpatory or because it impeaches; the evidence was suppressed by the prosecution, either willfully or inadvertently; and prejudice ensued.

**Commonwealth v. Lambert**, 884 A.2d 848, 853-54 (Pa. 2005).

Significant to this appeal, our Supreme Court has clarified that "the Commonwealth's **Brady** obligation does not extend to information that is not in its possession, but rather is in the possession of the federal government, a different governing authority." **Commonwealth v. Roney**, 79 A.3d 595, 610 (Pa. 2013); **see also Commonwealth v. Simpson**, 66 A.3d 253, 267 (Pa. 2013) ("While the prosecution is responsible for ensuring the government's **Brady** responsibilities are met as regards evidence under the control of the police, [ ] we have not held Commonwealth prosecutors responsible under **Brady** for information held by federal authorities . . .").

Further, with respect to materiality, "the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." **Commonwealth v. Miller**, 987 A.2d 638, 655 (Pa. 2009) (citation omitted).

After careful review, we conclude that the trial court did not err in denying Appellant's motion for mistrial based upon a purported **Brady** violation. Appellant was required – but failed – to prove the existence of a

statement from Cartwright. *See Miller, supra* at 655 ("the mere **possibility** that an item of undisclosed information might have helped the defense . . . does not establish materiality in the constitutional sense") (emphasis in original). Without such specificity, it is not possible to determine whether the statement is relevant and material, and whether the Commonwealth possesses the material. Moreover, the trial court concluded, and Appellant agrees, that the purported evidence is not within the possession or control of the Commonwealth. Our case law provides that the Commonwealth's *Brady* obligation does not extend to information possessed by federal authorities. *See Roney*, 79 A.3d at 610; *Simpson*, 66 A.3d at 267. Thus, Appellant is not entitled to relief on this issue.

In his second issue, Appellant challenges the discretionary aspects of his sentence. We note that "[t]he right to appellate review of the discretionary aspects of a sentence is not absolute." *Commonwealth v. Zirkle*, 107 A.3d 127, 132 (Pa. Super. 2014). Rather, where an appellant challenges the discretionary aspects of a sentence, the appeal should be considered a petition for allowance of appeal. *Commonwealth v. W.H.M.*, 932 A.2d 155, 163 (Pa. Super. 2007).

As we observed in *Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010) (citing *Commonwealth v. Evans*, 901 A.2d 528 (Pa. Super. 2006)):

> An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:

> We conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, see [Pa.R.A.P.] 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

**Id.** at 170. Whether a particular issue constitutes a substantial question about the appropriateness of a sentence is a question to be evaluated on a case-by-case basis. **Commonwealth v. Kenner**, 784 A.2d 808, 811 (Pa. Super. 2001).

Here, Appellant has met the first three requirements by filing a timely appeal, preserving the issue in a post-sentence motion, and including a Pa.R.A.P. 2119(f) statement in his appellate brief. **See** Anders Brief at 24-25. Appellant contends that his sentence is excessive because the trial court failed to consider mitigating circumstances, which we perceive as a substantial question. **See Commonwealth v. Caldwell**, 117 A.3d 763, 770 (Pa. Super. 2015) ("This Court has . . . held that an excessive sentence claim – in conjunction with an assertion that the court failed to consider mitigating factors – raises a substantial question."). Because Appellant has presented a substantial question, we proceed with our analysis.

The sentencing court placed its reasons for Appellant's sentence on the record, considered all relevant factors, and had the benefit of a presentence investigation report (PSI). N.T., 8/2/19, at 18-19; **see also Moury**, 992 A.2d

at 171 (when the "sentencing court had the benefit of a [PSI], we can assume the sentencing court 'was aware of relevant information regarding defendant's character and weighed those considerations along with mitigating statutory factors'"). The court explicitly took into account "[a]ll of the mitigating information that's included in the [PSI] as well as what was presented during the sentencing hearing." N.T., 8/2/19, at 19. Moreover, in fashioning Appellant's standard range sentence, the court considered all evidence presented to the jury, the PSI, the sentencing guidelines, all mitigating factors, the effect on the community and Appellant's rehabilitative needs. *Id.* at 18-19. The court specifically emphasized its concern for the protection of the public in light of the evidence that Appellant orchestrated a "planned and brazen assassination." *Id.* at 19. Thus, we find no abuse of discretion by the trial court in fashioning Appellant's sentence, and conclude Appellant is not entitled to relief.

In his third issue, Appellant challenges the sufficiency of the evidence. Appellant avers that the Commonwealth failed to prove beyond a reasonable doubt that Appellant formed an agreement with another person to shoot and kill Parker. Appellant contends that because the evidence was insufficient to sustain his conviction, the trial court should have granted his motion seeking extraordinary relief in the form of an order arresting judgment of his conviction. *Anders* Brief at 29.

Our scope and standard of review of a sufficiency claim is well-settled:

[O]ur standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. [T]he facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Franklin*, 69 A.3d 719, 722 (Pa. Super. 2013) (citations and quotation marks omitted).

A person is guilty of conspiracy to commit a crime if with the intent of promoting or facilitating its commission, he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S.A. § 903(a). Thus, to prove conspiracy, the Commonwealth must demonstrate that the defendant: "(1) entered an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and, (3) an overt act was done in furtherance of the conspiracy." *Commonwealth v. Rios*, 684 A.2d 1025, 1030 (Pa. 1996); *see also* 18 Pa.C.S.A. § 903. Once the conspiracy is established beyond a reasonable doubt, a conspirator can be convicted of both the conspiracy and the

substantive offense that served as the illicit objective of the conspiracy. ***Commonwealth v. Miller***, 364 A.2d 886, 887 (Pa. 1976).

Proving the existence of such an agreement is not always easy, and is rarely proven with direct evidence. ***Commonwealth v. Spotz***, 716 A.2d 580, 592 (Pa. 1998). "An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities." ***Commonwealth v. Strantz***, 195 A. 75, 80 (Pa. 1937). Indeed, "[a] conspiracy may be proven inferentially by showing the relation, conduct, or circumstances of the parties, and the overt acts of alleged coconspirators are competent as proof that a criminal confederation has in fact been formed." ***Commonwealth v. Kennedy***, 453 A.2d 927, 929, 930 (Pa. 1982).

In rejecting Appellant's sufficiency claim, the trial court stated:

There was equally compelling evidence that [Appellant] planned and executed the killing of Parker with participation of co-conspirators. According to Scott, Daughtry said that [Appellant], Daughtry and a third person, presumably Dully, were "planning to put a hit out on [Parker]." According to Daughtry, [Appellant] gave Daughtry instructions on where to take Parker, and told Daughtry to remain in constant communication with him. The murder was set up on a street adjoining a fenced-in cemetery, which in turn, adjoined the driveway to [Appellant's] house. There was a break in the fence right by [Appellant's] property. When [Appellant] told Daughtry that they needed to move the car up, Daughtry texted Dully with [Appellant's] request, at the same time Daughtry heard the shots. Further, an individual matching [Appellant's] description was seen walking away from the car at around the time of the incident.

In addition, cellphone evidence strongly corroborated the other evidence of the conspiracy. The cellphone of Dully, the driver, was found in the car after the murder, and displayed the text message from [Appellant] stating, "He said pull up some more," corroborating Daughtry's testimony that [Appellant] had complained to him that he could not see the car and wanted them to move. The records from Daughtry's cellphone showed numerous calls to [Appellant's] cellphone in the minutes leading up to the time of the murder. In addition to the text to Dully to move the car, the records also showed the text to [Appellant] before the murder, in which Daughtry notified [Appellant] that they were on their way with Parker to the kill site, by texting, "we going to get that wet."

Finally, the ballistics evidence offered scientific proof that [Appellant] did not act alone in this case. The uncontested evidence conclusively showed that two distinct weapons were used in the shooting: a 45-caliber weapon and a .9 millimeter weapon. It is, of course, extremely unlikely that a single shooter used two different weapons to fire 25 bullets into the victim.

Trial Court Opinion, 6/25/20, at 10-12 (citations and footnote omitted).

Viewing all of the evidence admitted at trial in the light most favorable to the Commonwealth, we agree with the trial court that there was sufficient evidence for the jury to find that Appellant formed an agreement with another person to shoot and kill Parker. Thus, Appellant's third issue lacks merit.

Finally, our independent review reveals no other non-frivolous issues Appellant could raise on appeal. *See Dempster*, 187 A.3d at 272. We therefore grant Counsel's petition to withdraw and affirm Appellant's judgment of sentence.

Petition to withdraw granted. Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/10/2020</u>